**UNITED STATES DISTRICT COURT**

**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **GRADUATION SOLUTIONS, LLC** | : | |
| | : | |
| *Plaintiff,* | : | **No. 3:17-CV-1342 (VLB)** |
| | : | |
| **v.** | : | **March 26, 2020** |
| | : | |
| **ACADIMA, LLC and ALEXANDER** | : | |
| **LOUKAIDES,** | : | |
| | : | |
| *Defendants.* | | |

## RULING ON MOTION FOR JUDGMENT AS A MATTER OF LAW [DKT. 147] AND MOTION FOR NEW TRIAL [DKT. 148]

On June 27, 2019, a jury found Defendants Alexander Loukaides ("Loukaides") and Acadima, LLC liable on Plaintiff Graduations Solutions, LLC's ("Graduation Solutions" or "Plaintiff") claims of copyright infringement, trade-dress infringement, violation of Connecticut's prohibition against unfair competition, and unjust enrichment. The jury awarded Graduation Solutions $6.254 million dollars in compensatory and punitive damages, including $3.23 million dollars from Loukaides. In the wake of that verdict, Loukaides moves for, in the alternative, (1) renewed judgment as a matter of law [Dkt. 147], or (2) a new trial [Dkt. 148]. Because of the overlap in relevant law and arguments, the Court considers the motions together. After considering each party's briefing, the Court DENIES both motions for the reasons that follow.

### I.    Background

Graduation Solutions designs and sells graduation apparel and accessories, such as caps, gowns and tassels, through its website, graduationsource.com. [Dkt. 100 at 3]. Loukaides officially formed Acadima, LLC, also a graduation apparel company, in 2015, but operations began prior to that date. [Dkt. 126 (Jury Instructions) at 11].

In August 2017, Graduation Solutions filed a complaint against Acadima, LLC and Loukaides for copyright infringement under 17 U.S.C. § 101, *et seq.*; trade dress infringement under section 43(a) of the Lanham Act, 16 U.S.C. § 1125(a); false advertising under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); violation of the Connecticut Unfair Trade Practices Act ("CUTPA"); violation of Connecticut's common law prohibition against unfair competition; and unjust enrichment. [Dkt. 1 (Compl.)]. Graduation Solutions alleged that Acadima, LLC and Loukaides owned and controlled websites, including gradshop.com and acadima.com, which duplicated Graduations Solutions's website, graduationso urce.com ("Plaintiff's website"), and induced customer confusion. [Dkt. 31 (Second Amended Compl.)]. Graduation Solutions sought injunctive relief, compensatory damages, punitive damages, costs, and attorneys' fees. *Id.* Acadima, LLC defaulted, and so the only issue to be determined as to Acadima, LLC at trial was damages. [Dkts. 73 (Mot. for Default), 75 (Order on Default)]. Therefore, the trial focused on Graduation Solutions's claims against Loukaides.

Trial began on June 20, 2019 and lasted four days. Plaintiff argued and introduced evidence that Loukaides owned and controlled acadima.com and gradshop.com, that those websites duplicated features of Plaintiff's website, and

that, in doing so, those websites confused Plaintiff's customers into mistaking those websites for Plaintiff's website. [Dkt. 113 at 18-21, 78:2-79:20, 170:1-4, 173:4-14, 108:2-24, 119:4-14; 122: 20-123:24, and 137:1-139:8]. Plaintiff presented evidence that Acadima, LLC had gross annual revenues of $1.3 million dollars. [Dkt. 140 at 77:14-16, 110:10-18], and Plaintiff's financial expert testified that Plaintiff lost profits of $1,512,000.00 due to the conduct of Acadima, LLC and lost profits of $1,936,000.00 due to the conduct of Loukaides. [Dkt. 140 at 116:15-118:14]. Loukaides responded that Acadima, LLC, rather than Loukaides, owned the websites and that Frank Seviane, Loukaides's former business partner and current owner of Acadima, LLC, was responsible for any copying, [Dkt. 113 at 26-33]. Plaintiff offered 114 exhibits for trial, of which 113 were admitted. [Dkt. 127 (Marked Ex. List)]. Loukaides offered one, which the Court did not admit. *Id.* Plaintiff also offered the testimony of four fact witnesses and an expert witness. *See* [Dkts 113, (6/20/2019 Trial Tr.), 140 (6/24/2020 Trial Tr.), 141 (6/25/2020 Trial Tr.), 142 (6/27/2019 Trial Tr.)]. Loukaides put on two witnesses. [Dkts. 140, 141].

After Plaintiff presented its case in chief, Loukaides moved for a directed verdict. [Dkt. 115 (Mot. for Directed Verdict)]. After hearing oral argument, this Court denied the motion. [Dkt. 141 at 78:2-89:18]. The jury found that Acadima, LLC was liable for $1,512,000.00 in actual damages, and $1,512,000.00 in punitive damages. [Dkt. 124 (Jury Verdict) at 1-2]. The jury found that Loukaides was liable for copyright infringement, trade dress infringement under the Lanham Act, violation of the Connecticut Unfair Trade Practices Act, violation of Connecticut common law against unfair competition, and unjust enrichment, but that he was

not liable for false advertising under the Lanham Act. *Id.* at 3-4. Based on these liability findings, the jury awarded Plaintiff actual damages of $1,615,00.00 and punitive damages of $1,615,000.00 against Loukaides. *Id.* at 2.

## II.  Motion for a New Trial

Loukaides moves for a new trial pursuant to Federal Rule of Civil Procedure 59, arguing that the Court made six critical and independent legal errors. [Dkt. 148 (Def. Mot. New Trial), Dkt. 149 (Def. Mem. Supp. Mot. New Trial)]. Graduation Solutions opposes the motion. [Dkt. 156]. Loukaides replies. [Dkt. 161]. The Court addresses each argument in turn.

### A. *Legal Standard*

Rule 59 permits a court, on motion, to "grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action in federal court." Fed. R. Civ. P. 59(a)(1)(A). To grant a new trial, the court must view the jury's verdict as against the weight of the evidence. *Manley v. AmBase Corp.,* 337 F.3d 237, 245 (2d Cir. 2003). "[A] decision is against the weight of the evidence . . . if and only if the verdict is [(1)] seriously erroneous or [(2)] a miscarriage of justice." *Farrior v. Waterford Bd. of Educ.,* 277 F.3d 633, 635 (2d Cir. 2002). "[R]elief is not to be granted unless the movant demonstrates that the error was not harmless." *Leo v. Long Island R. Co.,* 307 F.R.D. 314, 321 (S.D.N.Y. 2015) (quoting *Tesser v. Board of Educ. Of City Sch. Dist.,* 370 F.3d 314, 318-21 (2d Cir. 2004)).

In reviewing motions for a new trial, the judge "may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012) (citing *United States v. Landau*, 155 F.3d 93, 104 (2d Cir. 1998)). But where "a verdict is predicated almost entirely on the jury's assessments of credibility, such a verdict generally should not be disturbed except in an egregious case, to correct a seriously erroneous result, or to prevent a miscarriage of justice." *Raedle*, 670 F.3d at 418-19.

### Analysis

### B. Instruction on Exhibit A

Loukaides first argues that the Court erred in giving an instruction on the inadmissibility of Loukaides's Exhibit A ("Exhibit A"), a single piece of paper which appeared to be a portion of an email dated July 5, 2016 sent by non-party Frank Seviane ("Seviane") to non-party Elizabeth Barwick. [Dkt. 149 at 4-11]

Before trial and outside the presence of the jury, Loukaides attempted to submit Exhibit A into evidence. [Dkt. 140 at 12:11-14:20]. Graduation Solutions objected under Federal Rules of Evidence 901 and 801 that Exhibit A could not be authenticated and contained inadmissible hearsay. [Dkt. 100 at 24 (Joint Trial Mem. Sched. F)]; [Dkt. 140 at 14:22-15:3]. Loukaides argued that portions of the deposition transcript of Frank Seviane should be sufficient to deem Exhibit A self-authenticating and reliable. [Dkt. 140 at 13:12-14:20, 16:7-18:5]. But Seviane was not shown Loukaides's Exhibit A during his deposition, he did not admit to sending or knowing about it, and he did not in any way otherwise authenticate it. *Id.* at 19.

Further, when asked about how Loukaides came into possession of Exhibit A, since he was not a sender or recipient, Loukaides represented that Seviane forwarded him the email. *Id.* at 16:7-11. But he failed to present the complete forwarded email as part of Exhibit A. *Id.* After considering these facts, the Court found that the email excerpt marked Exhibit A could not be admitted with just its present support. *Id.* at 18:5-19:16.

Later that day, Loukaides's counsel questioned him on Exhibit A in front of the jury, and again attempted to lay the foundation to offer Exhibit A into evidence. [Dkt. 140 at 183]. The Court repeatedly cautioned Loukaides and his counsel to not "not reference anything in the email," but only "categorically describe what the document is." *Id.* at 180:1-20. Nevertheless, before the document was admitted, Loukaides testified that Seviane had forwarded him an email showing that Seviane had a content writer for the websites. *Id.* at 183:14. Graduation Solutions's counsel objected and the Court excused the jury to "address this evidentiary issue." *Id.* at 183:17-20.

After the jury exited, Loukaides again told the Court that the email had been forwarded to him. *Id.* at 186:5. The Court asked Loukaides to produce the entire forwarded email, and Loukaides said he would have to look for it. *Id.* at 186:6-7. At this point in the exchange, out of the presence of the jury, the Court said "this is beginning to look like a fraud on the Court and the jury." *Id.* at 188:7-8. The Court recessed. Upon return from recess, and still out of the presence of the jury, the Court confirmed with Loukaides's counsel that counsel had explained to

Loukaides his obligations as a witness and that "the testimony he has given casts... his credibility in doubt." *Id.* at 191.

Before bringing the jury back in, the Court informed counsel that the Court planned to instruct the jury that the email is "not admissible and that the jury should disregard all testimony concerning" it because it is "hearsay" and has "no indicia of reliability," even though "Mr. Loukaides testified under oath that the email was forwarded to him," because "Mr. Loukaides is unable to produce his portion of this email, or any evidence that it was ever forwarded to him." [Dkt. 142 at 192]. The Court asked for objections, *id.*, but neither party offered an objection. Once the jury was brought back in, the Court gave the jury a curative instruction. The Court reproduces that instruction below, and underlines the sections highlighted as objectionable by Loukaides in his motion for new trial:

"You may recall this morning the defense offered an email. I ruled that the email was not admissible. I ruled that it wasn't admissible under the rules of evidence. The rules of evidence are designed to permit the jury to see and to hear only information which has a reliability – is reliable. And we use the term indicia of reliability, sense of reliability, some credibility, so that if someone were to type a document and try to admit it, and it wasn't on letterhead or it wasn't stamped, or no one could testify authoritatively where it came from as we call it, authenticating it, then it would not be admissible. Because, of course, anyone can fabricate evidence. Evidence has to have some reliability. I ruled this morning that the purported email the defense wanted to admit was not admissible, because it simply contained letters one a piece of paper. And it was printed landscape, as opposed to in letter form, which most email in this country tend to be. I found that it did not fall within an exception to the hearsay rule, and I prevented it from being admitted. However, I expressly left the door open for the defendant to seek to offer it again if they could [admit] in evidence some basis for its authenticity or its reliability otherwise.

Mr. Loukaides took the stand and swore and oath to tell the truth, swore and oath so help him god, and under penalty of perjury, to tell the truth. And he testified in response to my specific question whether this

email was forwarded to him affirmatively. <u>In other words, he testified yes to my question as to whether the email had been forwarded to him.</u> Now, clearly, if the email had been forwarded to him, and he had a copy of the email forwarded to him, and perhaps his response back, then he could authenticate it. But when asked where the forwarded email was he said he testified that he did not have it. Between the time he said it was forwarded, and between the time he said he didn't have any evidence that it was forwarded to him, he testified as to its content. He testified that the email consisted of a communication between Mr. Seviane and a woman named Elizabeth, whose last name was variously described, and that the email described Elizabeth as a copyrighter, and suggested that Elizabeth was the person who wrote the content of the Acadima website.

    <u>I instruct you that that email is not admissible, and that nothing that you have heard in this courtroom concerning that email may be considered by you as evidence. It is not reliable, and you may not consider it.</u> And I apologize to you for even allowing [you] to hear anything about it. We're going to proceed with the balance of Mr. Loukaides's testimony.

    All right. <u>Mr. Loukaides, I remind you that you remain under oath and under penalty of perjury.</u> And please remember to answer the questions and only the questions. Do not attempt to curry favor with the jury by disclosing your personal problems."

[Dkt. 140 at 193-95].[1]

    "The ultimate decision as to all witnesses' credibility and as to the persuasive force of their testimony is for the trier of fact," here, the jury. *Presley v. U.S. Postal Serv.*, 317 F.3d 167, 178 (2d Cir. 2003). The Second Circuit has held that a new trial should be granted where a trial judge "asks questions bearing on the

---

[1] Loukaides had given non-responsive testimony about his divorce proceedings at several points prior. *See, e.g.,* [Dkt. 140 at 161:2-161:13] ("[Plaintiff's counsel]: [D]id you sell Yulex or Directline, can you explain to the jury what those two companies are? [Loukaides]: No. They were – they're companies which, as I said, a bad divorce with my ex-wife. I lost pretty much everything. I almost lost my son. Still – she's filed another thing against me, so I might lose my son for a second time and have to fight for him. So with – I'm sorry, because I just – could you repeat that? [Plaintiff's counsel]: Sure. The Court: Mr. Loukaides, the question – we're interested in your companies."); *id.* at 159:22-160:14, *id.* at 163:1-164:4, *id.* at 172:25-173:14.

credibility of a defendant-witness prior to the completion of direct examination," where the "sole purpose" of the questioning "was to challenge the credibility of the witness." *United States v. Victoria*, 837 F.2d 50, 55 (2d Cir. 1988). And, "[w]hen such doubt is injected by the court in a case where credibility of a defendant-witness is a key issue, there has been a deprivation of a fair jury trial." *Id.*

But a trial judge may ask a witness questions for the purpose of "the clarification of ambiguities, the correction of misstatements or the development of information used to make rulings." *Id.* Indeed, "[t]he court must decide any preliminary question about whether… evidence is admissible." Fed. R. Evid. 104(a). And "where evidence has been improperly admitted," a district court must give a "curative instruction… sufficient to render the error harmless." *United States v. Lawrence*, 767 F. App'x 77, 80 (2d Cir. 2019). "It is imperative that limiting instructions be clear and unequivocal." *United States v. Williams*, 585 F.3d 703, 709 (2d Cir. 2009) (quotations omitted). Courts' limiting instructions on the inadmissibility of evidence do not impermissibly undermine the credibility of a witness who has testified in support of that evidence. *Etim v. Bd. of Trustees of Connecticut State Univ.*, 164 F.3d 617 (2d Cir. 1998) (holding that the transcript "revealed no attempt by the district court to influence the jury's perception of the probative value of Etim's evidence" where the district court commented on the inadmissibility of his exhibits, including "admonishing the jury not to consider hearsay allegations that Etim made in a letter.")

The Court finds that it did not err in its comments to Loukaides or in its curative instruction. First, to the extent that the Court asked Loukaides questions

regarding Exhibit A, it did so for the permissible purpose of developing information used to make rulings, and not for the "sole" purpose of challenging his credibility. The Court dismissed the jury before asking Loukaides any questions. [Dkt. 140 at 183:17-20]; *see United States v. DiTommaso*, 817 F.2d 201, 221 (2d Cir. 1987) (holding that judge's reprimand of counsel "furnishes no basis for reversal if made outside of the jury's presence" even if unwarranted). The Court prefaced the discussion with the comment that it intended to address the "evidentiary issue." *Id.* at 183:20. Finally, the Court asked Loukaides no further questions once it was satisfied that it understood the facts necessary to make a ruling, and it did make a ruling. *Id.* at 192:2-22.

Next, the Court's statements to the jury were required since it found Exhibit A inadmissible. Ignoring the Court's previous evidentiary ruling and the Court's repeated cautions against discussing the contents of an exhibit inadmissible without additional corroboration, Loukaides testified about Exhibit A's contents, that a woman named Elizabeth was the person who wrote the content of the acadima.com. [Dkt. 140 at 180:1-183:14]. As discussed below, the Court found that the Exhibit A was inadmissible under Federal Rules of Evidence 901 and 807, so any discussion of it possibly jaundiced the jury. Therefore, here, as in *Etim*, the Court was required to unequivocally tell the jury that the email was hearsay and could not be considered. 164 F.3d 617. The Court's reminder to Loukaides that he was still "under oath" is standard when a witness resumes testifying after a recess. *See* [Dkt. 113 at 84:20, 136:15, 170:24-25], [Dkt. 140 at 119:23] (reminding Plaintiff's witnesses that they were "under oath" on return from recess).

Further, to the extent that Loukaides argues that the Court's comments improperly undermined his credibility, any error was harmless and any impact immaterial because Loukaides's credibility was more significantly impacted by the contradiction between his trial testimony and his prior sworn statement:

> [Plaintiff's counsel]: Well, let's keep going. Let's keep going, because gradshop.com sold graduation apparel over the internet, did it not?
>
> [Loukaides]: Gradshop does sell graduation products over the internet.
>
> …
>
> [Plaintiff's counsel]: Oh, actually, why don't we just go to page 8 of the postnuptial agreement?
>
> …
>
> [Plaintiff's counsel]: Read that sentence, starting with the word "All". What does that say?...
>
> …
>
> [Loukaides]: "All intellectual property related to said trademarks and domain names shall be owned by Alex."
>
> [Plaintiff's counsel]: "All intellectual property related to said trademarks and domain names shall be owned by Alex." And that's Exhibit D?
>
> [Loukaides]: Correct.
>
> [Plaintiff's counsel]: So now let's go back down to Exhibit D…
>
> [Loukaides]: Sure.
>
> [Plaintiff's counsel]: And… what does this say right here, what's this word?
>
> [Loukaides]: URL.
>
> [Plaintiff's counsel]: That's domain names, right?

[Loukaides]:  Yes.

[Plaintiff's counsel]: And what is this one?

[Loukaides]:  gradshop.com.

…

[Plaintiff's counsel]: I'm going to ask you another question now. You swore under oath in this case, in an interrogatory, that's a written question, on February 7, 2017, you swore under oath that you've not owned any websites for the promotion, marketing, or sale of graduation products, you remember answering that question?

[Loukaides]:  Yes. And that --

[Plaintiff's counsel]: So let's go to that one, shall we.

…

[Loukaides]:  "Defendants have not owned or operated and do not own or operate any websites for promotion, marketing, sale, graduation products, nor does Alexander own any such websites."

[Plaintiff's counsel]: Now you read that really quickly. I'll slow it down a bit. It says, "Defendants, Acadima, LLC and" who?

[Loukaides]:  "Alexander Loukaides."

[Dkt: 140 at 215:3 – 218:17]; *see id.* at 212, 219. Thus, any possible harm to Loukaides's credibility was immaterial.

Finally, none of the precedent Loukaides offers compels a different conclusion. The proffered cases address situations in which the trial judge asked a witness questions bearing on the witness's credibility (a) in front of the jury and (b) without any evidentiary purpose, both key distinguishing features present in the instant case. *See United States v. Filani*, 74 F.3d 378, 387 (2d Cir. 1996); *Pescatore v. Pan American World Airways, Inc,* 97 F.3d 1, 20 (2d Cir. 1996); *United*

*States v. Mazzilli*, 848 F.2d 384, 388 (2d Cir. 1988); *United States v. Victoria*, 837 F.2d 50, 55 (2d Cir. 1988).

### C. *The Authentication of Exhibit A*

Loukaides also argues that it was error for the Court to interrupt Loukaides during his testimony about Exhibit A because, had the Court not interrupted, Loukaides could have laid a foundation for its admission by explaining that the email was sent from Seviane's @hzoz.com account, for which Mr. Loukaides, as the owner of the company, was the records custodian. [Dkt. 149 at 9-10], [Dkt.161 at 5-6].

Hearsay may not be admitted for the truth of the matter asserted unless it falls under an exception, or the evidence is otherwise self-authenticating. Fed. R. Evid. 801, 902. The Court infers that Loukaides's contention is that, had he been able to fully explain himself, he could have argued for the admission of the email under the regularly conducted activity records exception. Loukaides's argument that the email excerpt was admissible under this exception is unavailing.

To qualify for the regularly conducted activity records exception, the document must meet the following criteria:

(A) the record was made at or near the time by--or from information transmitted by--someone with knowledge;

(B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

(C) making the record was a regular practice of that activity;

**(D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and**

**(E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.**

Fed. R. Evid. 803(6).

For evidentiary rulings, a new trial should be granted if the ruling affected a party's substantial rights. *Marcic v. Reinauer Transp. Cos.*, 397 F.3d 120, 124 (2d Cir. 2005). A substantial right is affected if the jury's judgment was likely swayed by the error in some material respect. *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 150 (2d Cir. 1997). The Court finds that Loukaides has not shown that its ruling affected his substantial rights for three reasons.

First, Loukaides's attorney did not lay a foundation for the introduction of the email excerpt before seeking to offer it as is customary when introducing a document under this rule. *See United States v. Stewart*, 433 F.3d 273, 317 (2d Cir. 2006) (explaining foundation requirements under the rule). After questioning Loukaides, the Court asked Loukaides's counsel for "supplemental indicia of reliability or otherwise," inviting him to offer additional arguments for the admission of Exhibit A. [Dkt. 140 at 189:8-13]. Loukaides and his counsel were free to make the records-custodian argument at that time but did not.

Second, Loukaides testified that "the person that works for me is the administrator for this email as well," not that he himself was the records custodian. [Dkt. 140 at 186]. He had also previously testified that he was in China and Seviane operated the company day to day. [Dkt. 140 at 165:12-22]. Thus, per his own earlier

testimony, Loukaides was not the keeper of the record within the meaning of Rule 803. *Cf. Morgan Guar. Tr. Co. v. Hellenic Lines Ltd.*, 621 F. Supp. 198, 217 (S.D.N.Y. 1985) (finding that, for the purpose of the rule, corporate director was qualified witness, though not custodian, where he identified exhibits as minutes of meetings of board of directors at which he was present).

Finally, even if Loukaides were custodian of records, he would have needed to establish that Exhibit A had "sufficient indicia of trustworthiness to be considered reliable" and met the other requirements of Rule 803(6), which he does not contend he could do. The document was a portion of an email conversation excerpted by Loukaides for the purpose of introducing it at trial in defense of the action. [Dkt. 140 at 184:6- 186:12]. Consequently, the source, method and circumstances of its preparation indicate a lack of trustworthiness. *See* Fed. R. Evid. 803(6)(E); *see CSI Inv. Partners II, L.P. v. Cendant Corp.*, 507 F. Supp. 2d 384, 420 (S.D.N.Y. 2007), *subsequently aff'd,* 328 F. App'x 56 (2d Cir. 2009) (finding inadmissible a document produced only once and in connection with litigation). The document would not have qualified for admission as a self-authenticating document either which explains why Loukaides did not argue that it did. Fed. R. Evid. 902(11).

### D. *Second Curative Instruction*

Next, Loukaides argues that the Court erred in not giving a curative instruction once the Court became aware that Loukaides had located the forwarded email underlying Exhibit A. After court on June 24th, 2019, Loukaides was able to return

to his computer and locate the forwarded copy of the email. [Dkt. 149-2 (Ex. B to Mem. Supp. Mot. for New Trial)]. The next day, Loukaides's counsel stated:

> It wasn't clear to me, Your Honor, if the Court was ordering that we search for a forwarded copy of that document or not; if the Court was, if the document has been located, I have no intention of offering it into evidence.

[Dkt. 141 at 10:4-10]. Loukaides argues that, once the Court was aware that Loukaides in fact had the email, the Court had an obligation to correct the erroneous impression it conveyed to the jury regarding Loukaides's credibility. [Dkt. 149 at at 11], [Dkt. 161 at 6-7].

The Court is not persuaded. First, Loukaides's counsel did not affirmatively state that he had located the forwarded email. Even if he did, he clearly stated that he *did not* intend to offer it into evidence, so the Court did not have a second opportunity to evaluate its admissibility. Moreover, Loukaides's counsel did not ask the Court for a curative instruction. In this circumstance, the Court would not have been justified in giving a *sua sponte* curative instruction, let alone compelled to do so. Indeed, a *sua sponte* curative instruction may in fact have been inappropriate because it would have shone a spotlight on the question of Loukaides's credibility. *See United States v. Deandrade*, 600 F.3d 115, 119 (2d Cir. 2010) (holding no error for failure to give sua sponte curative instruction to disregard testimony that defendant had previously been incarcerated because "a curative instruction could easily have done more harm than good by focusing the jurors on two allusive references that they otherwise might have missed or construed as innocuous.").

Loukaides cites *United States v. Kerr*, 981 F.2d 1050, 1054 (9th Cir. 1992). There, the Ninth Circuit considered whether a district court should have provided additional instructions to a jury after a U.S. Attorney repeatedly introduced his personal opinion of the witness's credibility, stating that he thought government witnesses were "candid," "honest," that their stories weren't "pat," and suggesting that if the jury disagreed with him, they must think that he had been "hoodwinked." *Id.* at 1052-53. But here, unlike in *Kerr*, the Court only addressed Loukaides's credibility as far as it was relevant to the Court's proper and required evidentiary ruling, as explained above.

### E. *Amendment of Pleadings to Conform to the Evidence*

At the close of evidence, Graduation Solutions moved to amend its pleadings to conform to the evidence adduced at trial "to incorporate Gradshop." [Dkt. 141 at 71: 12-17, 82:21-23]. Over Loukaides's objection, the Court granted the motion. *Id.* at 86:16-88:6. Loukaides now argues the Court erred in doing so. [Dkt. 149 at 14 -22].

With regard to amendments during trial, Rule 15 states:

(1) ***Based on an Objection at Trial.*** If, at trial, a party objects that evidence is not within the issues raised in the pleadings, the court may permit the pleadings to be amended. The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits. The court may grant a continuance to enable the objecting party to meet the evidence.

(2) ***For Issues Tried by Consent.*** When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move--at any time, even after judgment--to amend the

> pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial of that issue.

Fed. R. Civ. P. 15(b). "The decision of whether to allow such an amendment is left to the discretion of the district court judge." *Vermont Plastics, Inc. v. Brine, Inc.*, 79 F.3d 272, 279 (2d Cir. 1996).

Here, Graduation Solutions tried its claims regarding Gradshop.com by consent. Although Graduation Solutions submitted more than ten exhibits relevant only to Gradshop.com, Loukaides did not object that any of them was not within the issues raised by the pleadings. *See* [Dkt. 100 (Joint Trial Mem.) at 7]; [Dkt. 127 (Marked Ex. List) at Exs. 10, 16, 93-106]; *compare* Fed. R. Civ. P. 15(b)(1) (objection sub-section applies if "at trial, a party objects that evidence is not within the issues raised in the pleadings") *with* Fed. R. Civ. P. 15(b)(2) (consent sub-section otherwise applies). Further, Loukaides himself proposed three trial exhibits related solely to Gradshop.com, more than ten percent of all of his proposed exhibits. [Dkt. 100 (Joint Trial Mem.: Def.'s Ex. List) at 14, Exs. E, G and I]; *see Conjugal P'ship Comprised by Joseph Jones & Verneta G. Jones v. Conjugal P'ship Comprised of Arthur Pineda & Toni Pineda*, 22 F.3d 391, 400–01 (1st Cir. 1994) ("implied consent is generally found where the opposing party actually produced evidence on the new issue"). Thus, the issue was tried by consent. Since an issue tried by consent "must be treated in all respects as if raised in the pleadings," Fed. R. Civ. P. 15(b)(2), the Court's decision to allow the amendment was required. But, since Loukaides ultimately objected to Graduation Solutions's motion to amend as

prejudicial, [Dkt. 141 at 86-87], the Court will go on to consider the issue as if it were not tried by consent.

The Court thus evaluates whether Loukaides was prejudiced by the amendment, that is, whether he had "a fair opportunity to defend and whether he could offer any additional evidence if the case were to be retried on a different theory." *Royal Am. Managers, Inc. v. IRC Holding Corp.*, 885 F.2d 1011, 1017 (2d Cir.1989).

Graduation Solutions's Second Amended Complaint gave Loukaides sufficient notice. [Dkt. 31]. It was filed more than sixteen months before trial and refers expressly to Gradshop.com in over twenty paragraphs, all of which are realleged by reference in each of Graduation Solutions's causes of action. *Id.* at ¶¶ 12, 19-25, 32-33, 40-42, 47-48, 67-69, 71, 76, 92, 94]. The Complaint included a visual comparison of gradshop.com and Plaintiff's Website "as an example of Defendants' bad faith and unauthorized use of the GS Website for their GradShop website." *Id.* at ¶ 67. Moreover, Graduation Solutions's allegation that the "the acts of defendant Loukaides'[s] operation of… Defendants' Websites include[s]… direct copying of Plaintiff's copyrighted material and trade dress and unfair competition as set forth above, which is purposefully intended to divert customers from Plaintiff's website…" refers to gradshop.com, which is one of "Defendants' Websites." *Id.* at 75, 19; *see also* ¶ 73-79.

Further, more than two months before trial, Graduation Solutions stated that the case included claims about gradshop.com in the parties' jointly submitted Joint Trial Memorandum. [Dkt. 100 at 3]. The Joint Trial Memorandum also contained the

parties' proposed exhibits, which the parties exchanged before submitting the Memorandum. [Dkt. 100 at 7, 12-13 (Schedule A: Plaintiff's Exhibit List), 14-15 (Schedule B: Defendant's Exhibit List)]. Plaintiff's exhibit binder was replete with screen shots of gradshop.com. *Id* at 12-13. While not using the magic words of "infringement" or "confusion," these pleadings are sufficient to put Loukaides on notice. *See Ostano Commerzanstalt v. Telewide Sys., Inc.*, 880 F.2d 642, 646 (2d Cir. 1989) (holding that "defendants could not have been prejudiced" by the addition of an additional party as a plaintiff after the close of trial "given the many references to the [additional party] in the pretrial order"). And, as the Court has previously observed, "Loukaides was probably in a better position than even the plaintiffs to know the significance of those allegations" because of his association with Gradshop.com. [Dkt. 141 at 87:18-24]. Indeed, Loukaides had sufficient notice to offer evidence on the Gradshop.com claims—as discussed above, he proposed three exhibits related only to Gradshop.com, more than ten percent of all of his proposed exhibits. [Dkt. 100 at 14, Exs. E, G, I].

Loukaides argues that he made clear his belief that Gradshop.com was not at issue, as his counsel stated that the relevant websites "are not gradshop.com," [Dkt. 113 at 30:14-19] and that Graduation Solutions's CEO Matthew Gordon, testified that he believed that there was not a damages claim related to GradShop.com. [Dkt. 113 at 215:2-4]. But while Loukaides's counsel asserted that gradshop.com was not part of the case, he did not challenge any evidence about it as beyond the scope of the case, nor did he seek a continuance to meet Plaintiff's evidence on the question. And, as the Court has said before, "a stray remark by a

witness on the stand" does not provide "any factual basis for a claim of prejudice." [Dkt. 141 at 88:1-6].

### F. _Jury instructions after the close of evidence_

While challenges to jury instructions in civil cases are generally reviewed for "an error that is not harmless," "if the challenging party failed to object to the charge at trial," instructions are reviewed for "plain error, that is, if the error 'affects substantial rights.'" *Rasanen v. Doe*, 723 F.3d 325, 332 (2d Cir. 2013) (quoting Fed. R. Civ. P. 51(d)(2)).[2] "[A] jury instruction will be deemed adequate if the charge, taken as a whole, is correct and sufficiently covers the case so that a jury can intelligently determine the questions presented to it." *Id.* (quoting *Hathaway, v. Coughlin,* 99 F.3d 550, 554 (2d Cir.1996)). Conversely, "a jury charge is erroneous if it misleads the jury as to the correct legal standard, or if it does not adequately inform the jury of the law." *Keeling v. Hars*, 809 F.3d 43, 51–52 (2d Cir. 2015) (quoting *Hathaway,* 99 F.3d at 552) (considering unpreserved objection in a copyright context)."To constitute plain error, 'a court's action must contravene an established rule of law,' and 'go to the very essence of the case.'" *Rasanen*, 723 F.3d at 333 (quoting *Lavin–McEleney v. Marist Coll.,* 239 F.3d 476, 483 (2d Cir.2001) and *Anderson v. Branen,* 17 F.3d 552, 556 (2d Cir.1994)). The plain error exception to Rule 51's objection requirement "should only be invoked with extreme caution in the civil context." *Keeling*, 809 F.3d at 52 (quoting *Rasanen*, 723 F.3d at 333).

---

[2] Graduation Solutions argues that a "fundamental error" standard applies to unpreserved objections.  But after the 2003 amendment to Federal Rule of Civil Procedure 51(d), the Second Circuit instead applies a "plain error" standard. *Rasanen*, 723 F.3d at 332 n.2.

In this case, the parties had ample opportunity to comment on the instruction to be given the jury. They submitted proposed jury instructions as part of their Joint Trial Memorandum, [Dkt. 100 at 9] and [Dkt. 100-1 (Schedule E: Proposed Jury Instructions)] and also submitted proposed instructions after the case in chief. [Dkt. 120 (Plaintiff's Proposed Jury Instructions)] and [Dkt. 121 (Loukaides's Proposed Jury Instructions)]. The parties were given the court's proposed jury instructions in advance and were then given three opportunities to review the proposed jury instructions and voice objections. [Dkt. 142 at 3:19-9:21]; *Id.* at 63:14 – 16; *Id.* at 74:8-10. They raised no objection related to any error alleged in the current motion. *Ibid.* [3] Because there was no objection, the Court will review its jury instructions for plain error.

---

[3] On the evening of June 26, 2019, the Court held a conference call with counsel for the parties to discuss any issues related to the jury instructions. [Dkt. 122 (Minute Entry, 6/26/2019 Telephonic Charge Conference]. The next day, outside the presence of the jury, the Court presented the proposed jury instructions to counsel to review prior to reading them to the jury. [Dkt. 142 at 3:19-9:21]. The Court expressly asked counsel to review the proposed jury instruction and to voice any objections. *Id.* Loukaides's counsel noted only one "technical objection in paragraph 43 of the jury charge," which the Court addressed and fixed. *Id.* at 9:9-13. The Court then read the jury the charge, as agreed by both parties. *Id.* at 9:24 – 63:14. The Court then once again asked counsel whether they had any objection to the jury charge as it was delivered. *Id.* at 63:14 – 16. Loukaides's counsel raised one objection regarding the Court's use of the language "you have to find that Plaintiff demonstrated by the preponderance of the evidence" on page 23 of the instructions. This language was not related to any error alleged in the current motion. *Id.* at 63:15-64:8. The Court gave the jury a supplemental instruction to address counsel's concern. *Id.* at 66:17 – 74:10. The Court then, for the third time that day, asked counsel whether they had objections to the jury charge. Loukaides's counsel replied that he had no objections. *Id.* at 74:8-10.

### i. Instructions regarding the interaction of the Lanham Act and the Copyright Act

As his next ground for a new trial, Loukaides argues that the Court erroneously failed to instruct the jury that Graduation Solutions could not recover under both the Copyright Act and the Lanham Act for the same elements of its website. [Dkt. 149 at 22-23] (citing [Dkt. 126 (Jury Instructions]). Really, Loukaides's argument is that the Court did not clarify that damages for the "same conduct and the same loss" can be awarded more than once against the same defendant. [Dkt. 149 at 23].

While "a plaintiff seeking compensation for the same injury under different legal theories is of course only entitled to one recovery," *Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 497 (2d Cir.1995), where one action causes distinct injuries under the Lanham Act and the Copyright Act, awards under both are appropriate. *Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, 176 F. Supp. 3d 137, 175 (E.D.N.Y. 2016) (upholding award of $10 million in statutory trademark infringement damages and $75,000 in statutory Copyright Act damages, as the injuries were distinct); *c.f. Cengage Learning, Inc. v. Globonline SDN*, No. 14 CIV. 3174 (DAB), 2018 WL 1989574, at *2 (S.D.N.Y. Apr. 25, 2018) (collecting cases and noting that the "recent trend" in this Circuit is to "preclude double recovery of statutory damages" when damages under the Copyright Act and the Lanham Act are "co-extensive.").

The jury instructions did not clearly distinguish between which injuries were alleged to result from the trade dress infringement claims and which injuries were

alleged to result from the copyright infringement claims. The Court's copyright damages instruction provided:

> Under the Copyright Act, the plaintiff is entitled to recover either (1) the copyright owner's actual damages and any additional profits of the infringer or (2) statutory damages. Plaintiff in this case seeks actual damages plus Defendant's profits.

[Dkt. 126 (Jury Instructions) at 25]. The Court's trade dress damages instruction provides:

> As with Plaintiff's copyright claim, if you find for Plaintiff on the trade dress infringement claim, Plaintiff is entitled to actual damages as well as any profits earned by Defendant that are attributable to the infringement.

[Dkt. 126 at 32].

The Court finds that there was no error because the Court's instructions made clear that the sum total of compensatory damages awarded to Plaintiff against Loukaides could not be greater than Plaintiff's actual damages:

> Plaintiff is entitled to recover the actual damages, also called compensatory damages, suffered by it as a result of the infringement / false advertising / unfair competition / unjust enrichment. Damages are compensatory in nature. <u>That means they are awarded to compensate a person, in so far as money can, for the injury they suffer because of the improper acts of a defendant</u>….

[Dkt. 126 at 40] (emphasis added). Here, the jury instructions clarify that actual damages are determined by the size of *injury* to Plaintiff, even if an injury is caused by multiple wrongful actions or a single action that improper under multiple different legal theories. Loukaides argues that the jury instructions do not expressly say that "damages for the same conduct and the same loss cannot be awarded more than once." [Dkt. 149 at 24]. Jury instructions must be read as a

whole and the jury was instructed to do so. *See* [Dkt. 126 at 4]. The talismanic words Loukaides now says the Court should have uttered are unnecessary reading the instruction as a whole.

Moreover, nothing said at trial would have suggested to the jurors that they could consider awarding damages for the same conduct and the same loss multiple times, and they did not do so. The jury instructions refer jurors to Plaintiff's expert's testimony and expert report. [Dkt. 126 at 42] ("Along with all other evidence, you may consider Mr. Argiz's Expert Report and his testimony on Plaintiff's economic losses when determining damages"). Plaintiff's expert, Antonio Argiz, testified about the lost profits related to "Acadima's copyright infringement, trade-dress infringement, false-advertising claims, et cetera," and about the lost profits related to "Mr. Loukaides's copyright infringement, trade-dress infringement, false advertising, unjust enrichment." [Dkt. 140 at 100:12-101:5]. When he testified, he made clear that his estimates were based on Plaintiff's actual damages, not multiples of them, so there was no possibility of a duplicative award. [Dkt. 140 at 117:23-118:14]. And, the jury was apparently guided by Argiz's estimate: after finding Loukaides liable on five of Plaintiff's six causes of action, the jury ultimately awarded Graduation Solutions $1,615,00.00 in compensatory damages against Loukaides, almost exactly five-sixths of the $1,936,000.00 damages estimated by Argiz. [Dkt. 124 at 4]; [Dkt. 140 at 100:18-23]. Therefore, the Court finds that, even assuming the Court erred in failing to give the instruction, the jury did not award excessive damages and thus Loukaides's substantial rights were not in fact affected.  This point is not grounds for a new trial.

*ii.    Trade Dress Instructions*

As his final ground for a new trial, Loukaides argues that the jury instructions on the trade dress claim erred in that they failed to define the legal terms "inherently distinctive," "descriptive," "secondary meaning," and "generic," definitions for which Loukaides proposed jury instructions. [Dkt. 149 at 25]; [Dkt. 121 at 29-32]. Graduation Solutions responds that the instructions the Court gave were sufficient. [Dkt. 156 at 38-42].

*1. Legal standard for plain error where jury instructions do not define terms of art*

Where a jury instruction uses a term of art which "can encompass a range of conduct" beyond its legal meaning, it must then elaborate on the term of art. *Hathaway v. Coughlin*, 99 F.3d 550, 554 (2d Cir. 1996). In *Hathaway*, the Second Circuit found that the undefined use of the word "malpractice" created an erroneous impression regarding the standard of liability. *Ibid.* The plaintiff alleged that the defendant was liable for deliberate indifference to the plaintiff's medical condition. *Id.* at 551. While deliberate indifference is not established by negligent medical malpractice, it is established by reckless medical malpractice. *Id.* at 553 (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). But the trial judge's instruction on malpractice did not distinguish negligent malpractice from reckless malpractice, and would "erroneously compel[] a juror to conclude that any medical malpractice precludes a finding of deliberate indifference." *Id.* at 554. The Court found the error was not harmless because it went "to the very heart of the plaintiff's claim." *Ibid.*; *see Keeling v. Hars*, 809 F.3d at 51–52 (2d Cir. 2015)).

The Second Circuit came to a similar conclusion in *Hendricks v. Coughlin*, 942 F.2d 109 (2d Cir. 1991). There, the plaintiff alleged two causes of action: "failure to protect him from another inmate's violence and excessive use of force against him." *Id.* at 113. The jury instructions accurately "stated a showing of intent was not necessary to establish liability but mere negligence was not enough" to establish liability for the failure-to-protect claim. *Ibid.* But, the instructions "did not explain the alternative degrees of intent," specifically, that if the jury "were to find that the defendants acted with reckless disregard for [Hendricks]'s constitutional rights, then they should reach a verdict for" Hendricks on the failure-to-protect claim. *Ibid.* In contrast, the instructions did state that a showing of recklessness was sufficient to support liability for the excessive force claim, creating the erroneous "impression that, unlike the excessive force claim, a finding of recklessness on the failure to protect claim would not support a verdict in favor of" Hendricks. *Id.* at 113-14. The Second Circuit held that this error went "directly to plaintiff's claim, was not harmless" and "necessitate[d] a new trial." *Id.* at 114.

On the other hand, where the sought instruction is not proposed to the court and the instructions actually given are "substantially similar" to the sought instruction, or where a term is "intelligible enough… to be understood by a lay person," there is no plain error. *Snyder v. New York State Education Department,* 486 Fed. App'x 176, 179 (2d Cir. 2012) (Summary Order), *cert. denied,* 568 U.S. 1041 (2012) (finding no plain error where instruction on "otherwise qualified" was "intelligible enough" in the context of trial and actual damages instruction was "substantially similar" to the one sought).

### 2. Law on trade dress

The Lanham Act provides:

> **(1) Any person who…uses in commerce any word, term, name, symbol, or device, or any combination thereof ... which ... is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ... shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.**
>
> **….**
>
> **(3) In a civil action for trade dress infringement under this chapter for trade dress not registered on the principal register, the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional**.

15 U.S.C. § 1125.

To prevail on a claim of trade dress infringement based on a website allegedly copying the "look and feel" of another website, a plaintiff must show "(1) that its trade dress is inherently distinctive or has acquired secondary meaning; (2) that its trade dress is nonfunctional; and (3) that defendant's product creates a likelihood of consumer confusion." *Ingrid & Isabel*, 70 F. Supp. 3d 1105, 1136-37 (N.D. Cal. 2014). Courts typically organize these requirements into a sequential two-step showing: first, showing plaintiff's trade dress "merits protection" by showing that it is "distinctive," and then showing that defendant's product infringes by showing that it is "likely to cause customer confusion" and is non-functional. *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 216 (2d Cir. 2012) (registered trademark case).

"A mark or dress is distinctive when it identifies the particular source of the product or distinguishes it from other products." *Id.* at 1137 (quoting *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.,* 4 F.3d 819, 824 (9th Cir.1993)). A mark can be distinctive in one of two ways. First, a mark is inherently distinctive if "[its] intrinsic nature serves to identify a particular source." *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 210 (2000) (citing *Two Pesos, Inc. v. Taco Cabana, Inc*, 505 U.S. 763, 768 (U.S. 1992)); *see Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 10–11 (2d Cir.1976) (setting forth spectrum of marks from arbitrary to generic for trademarks). Second, a mark has acquired distinctiveness, if it is descriptive and has developed secondary meaning, that is, "in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself." *Id.* at 211. (2000). Neither color nor design can ever be inherently distinctive, and can only be distinctive upon a showing of a secondary meaning. *Id.* at 211-16.

"Given the conceptual similarity between 'look and feel' and 'design,' *Wal–Mart* suggests that Plaintiff must show that its website's 'look and feel' is distinctive through its secondary meaning[.]" *Ingrid & Isabel, LLC*, 70 F. Supp. 3d at 1137. "Factors that are relevant in determining secondary meaning include '(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and, (6) length and exclusivity of the mark's use.' "*Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 226 (2d Cir. 2012) (quoting *Genesee Brewing Co. v. Stroh Brewing Co.*, 124

F.3d 137 143 n.4 (2d Cir. 1997)); *see Ingrid & Isabel*, 70 F. Supp. 3d at 1137. "No single factor is determinative… and every element need not be proved." *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1536 (2d Cir. 1992); *see Gasser Chair Co. v. Infanti Chair Mfg. Corp.*, 155 F.3d 565, 47 USPQ2d 1208, 1211 (Fed. Cir. 1998) (unpublished opinion) (applying Second Circuit law to affirm district court's finding of secondary meaning based primarily on deliberate copying and actual confusion). Ultimately, "the true test of secondary meaning is the effectiveness of th[e] effort to create it," that is, whether the public associates trade dress with a product source. *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 824 (9th Cir. 1993); *see George Basch Co.*, 938 F.3d at 1536.

"A product feature is functional, and cannot serve as a trademark [or trade dress], if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Yurman Design, Inc. v. PAJ, Inc.,* 262 F.3d 101, 116 (3d Cir. 2001) (quoting *TrafFix Devices, Inc v. Marketing Displays, Inc.*, 532 U.S. 23, 31 (2001)). A functional feature is one the "exclusive use of [which] ... would put competitors at a significant non-reputation-related disadvantage." *Qualitex Co. v. Jacobson Prods. Co.,* 514 U.S. 159, 165 (1995).

*3. The Instant Case*

Here, the jury instructions explained that for a trade dress to be valid, it must be inherently distinct or have acquired secondary meaning:

> "Trade dress is the non-functional physical detail and design of a product or its packaging that is either (a) inherently distinctive or (b) descriptive but became distinctive through the development of secondary meaning."

[Dkt. 126 at 28]. The jury instructions went on to define "functional," and give a four factor test for determining if trade dress meets the non-functionality requirement, including "the design's utilitarian advantage," "availability of alternate designs," "advertising utilitarian advantage in the design," and "the design's method of manufacture." *Id.* at 28-30. Finally, the jury instructions described "likelihood of confusion," and provided seven factors for determining it, including: "whether the consuming public recognizes Plaintiff's trade dress as an indication of the origin of Plaintiff's goods," and "knowing use by Defendant Loukaides of Plaintiff's trade dress to identify similar goods." *Id.* at 30-31. But the jury instructions did not define "inherently distinctive," "descriptive," or "secondary meaning." They also did not mention "generic designs." Loukaides proposed definitions of these terms in his second set of proposed instructions, [Dkt. 149 at 25]; [Dkt. 121 at 29-32],[4] but, as earlier discussed, did not object to the Court's instructions. *See Caruso v. Forslund,* 47 F.3d 27, 31 (2d Cir.1995) (holding that submitting a proposed jury instruction is not enough to preserve an instruction except if the party makes its position known to the trial court and the "trial court has made clear that an objection would be futile.").

The Court finds that its non-definition of the terms "inherently distinctive," "descriptive," "generic" and "secondary meaning" does not constitute plain error,

---

[4] Loukaides did not propose these instructions in the joint trial memorandum, [Dkt. 100 at 9 (not objecting to Plaintiff's proposed jury instructions)], and only supported his proposed trial instructions with a citation to the Ninth Circuit Model Jury Instructions (which had been relied on by both parties in their instructions). [Dkt. 149 at 29]. Even in this motion for a new trial, Loukaides does not cite a single case supporting the use or importance of these instructions. *Id.* at 24-31.

because it gave "sufficiently similar instructions" that the jury could "intelligently determine the questions presented to it" based on the evidence. *Keeling*, 809 F.3d at 51–52; *see Snyder,* 486 Fed. App'x at 179.

First, the Court's jury instructions on "likelihood of confusion" were adequate to inform the jury of the core requirement of "distinctiveness." "A mark or dress is distinctive when it identifies the particular source of the product or distinguishes it from other products," regardless of whether it is "inherently distinctive" or is descriptive and has a "secondary meaning." *Ingrid & Isabel*, 70 F.Supp. at 1137 (quoting *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.,* 4 F.3d 819, 824 (9th Cir.1993)); *see Int'l Jensen, Inc.,* 4 F.3d at 824 (9th Cir. 1993) ("the true test of secondary meaning is the effectiveness of th[e] effort to create it,"). Given this core requirement, the fact that an infringing feature is likely to cause confusion is sufficient in and of itself to demonstrate that the infringed trade dress is distinctive—a person would only confuse Brand X's contoured bottle for a Coca-Cola bottle if she identifies contoured bottles with Coca-Cola. *See Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 210, 120 S. Ct. 1339, 1343, 146 L. Ed. 2d 182 (2000) ("without distinctiveness the trade dress would not cause confusion…"). Here, the Court set out the "likelihood of confusion" requirement and explained factors the jury should consider in determining whether it was met. Two of those factors duplicate the key Second Circuit acquired distinctiveness factors, "whether the consuming public recognizes Plaintiff's trade dress as an indication of the origin of Plaintiff's goods," and "knowing use by Defendant Loukaides of Plaintiff's trade dress to identify similar goods." *See Gasser Chair Co.*, 147 U.S.P.Q.2d at 1211

(applying Second Circuit law to affirm district court's finding of secondary meaning based primarily on deliberate copying and actual confusion). These factors would have been especially salient because the jury heard evidence of similarities between Plaintiff's website and gradshop.com and acadima.com, as well as evidence of actual confusion, that is, that individuals contacted Plaintiff about orders they had placed on gradshop.com. [Dkt. 113 at 170:1-4, 173:4-14, 108:2-24; 119:4-14; 122: 20-123:24, 137:1-139:8]. For these reasons, the Court finds that its jury instructions were "substantially similar" to those proposed by Loukaides, and adequate to inform the jury such that there is no plain error.

Second, the Court's jury instructions on the "non-functional" requirement were adequate to inform the jury of the essence of the non-generic/over-breadth requirement. The non-generic requirement originated in trademark common law as the rule that a "term" "referring to the genus of which the particular product is a species" could not receive trademark protection. *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976); *see Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 148 (2d Cir. 1997) (holding that "Honey Brown" is a generic term as applied to ales because it refers to a subcategory of ales). The non-functionality requirement is unique to trade dress. *See* 15 U.S.C. § 1125 ("In a civil action for trade dress infringement under this chapter for trade dress not registered on the principal register, the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional.").

The non-functionality requirement may substitute for the non-generic requirement in trade-dress actions. "The non-functionality requirement

substantially overlaps with the prohibition on overbroad marks…. Both principles ensure that a trademark right does not unduly stifle competition." *Yurman Design, Inc.,* 262 F.3d 101, 116 n. 5 (2d Cir. 2001) (applying both requirements to trade dress actions); *see* 1 William E. Levin, Trade Dress Protection § 17:14 (2d ed. June 2018 Update) ("Functionality should be the preferred manner to address what trademark law would consider to be a generic term."). Since the introduction of the statutory non-functionality requirement for trade-dress, the Supreme Court has not applied the non-generic requirement to trade dress. *Compare Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 773 (1992) (applying trademark rules to trade dress because, in the absence of a "textual basis" or other distinction, "there is no persuasive reason to apply different analysis to the two"), *with* Trademark Amendments Act of 1999, Pub. L. No. 106-43, 113 Stat. 218 (1999) (inserting non-functionality requirement for trade dress); *Wal-Mart*, 529 U.S. at 210 (2000) (omitting the non-generic requirement in trade-dress context). Loukaides does not specify any way in which the two requirements diverge or how the jury was misinformed or inadequately informed. *See* [Dkt. 159]. Here, the Court informed the jury at length that Graduation Solutions's trade dress must be "non-functional" to be protectable. Because this instruction informed the jury of the essence of the non-generic requirement, it was adequate to inform the jury, and there is no plain error.

III.   **RULING ON RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW or FOR NEW TRIAL [Dkt. 147]**

Loukaides renews his motion for judgment as a matter of law or for a new trial under Federal Rule of Civil Procedure 50(b). [Dkt. 147]. Graduation Solutions

responds. [Dkt. 155]. Loukaides replies. [Dkt. 162]. For the reasons that follow, the Court denies the motion.

### G. _Legal Standard_

Under Rule 50(a), judgment as a matter of law is appropriate "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). Under Rule 50(b), a party may renew after trial a motion for judgment as a matter of law brought during trial within 28 days of a judgment. Id.

"Under Rule 50(a), a motion for judgment as a matter of law must first be made before the case is submitted to the jury, and renewed following the verdict pursuant to Rule 50(b)." _ING Glob. v. United Parcel Serv. Oasis Supply Corp._, 757 F.3d 92, 97 (2d Cir. 2014). "As to any issue on which proper Rule 50 motions were not made, JMOL may not properly be granted by the district court, or upheld on appeal, or ordered by the appellate court unless that action is required in order to prevent manifest injustice." _Lore v. City of Syracuse_, 670 F.3d 127, 153 (2d Cir. 2012).

The movant must demonstrate that "the evidence, drawing all inferences in favor of the non-moving party and giving deference to all credibility determinations of the jury, is insufficient to permit a reasonable juror to find in [the opposing party's] favor." _Lavin-McEleney v. Marist Coll._, 239 F.3d 476, 479 (2d Cir. 2001); _see Reeves v. Sanderson Plumbing Products, Inc_, 530 U.S. 133, 150-51 (2000)("The

court must draw all reasonable inferences in favor of the nonmoving party" and "disregard all evidence favorable to the moving party that the jury is not required to believe." ) "A court should grant a motion for judgment as a matter of law after the jury has returned a verdict only when there is 'such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or . . . such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [people] could not arrive at a verdict against [it]." *Ladenburg Thalmann & Co., Inc. v. Modern Contintental Const. Holding Co., Inc.*, 408 Fed. Appx. 401, 403-04 (2d Cir. 2010) (quoting *Song v. Ives Labs, Inc.*, 957 F.2d 1041, 1046 (2d Cir. 1992)). In reviewing a renewed motion for judgment as a matter of law, "[t]he court may not itself weigh credibility or otherwise consider the weight of the evidence; rather, it must defer to the credibility assessments that may have been made by the jury and the reasonable factual inferences that may have been drawn by the jury." *Williams v. Cnty. Of Westchester*, 171 F.3d 98, 101 (2d Cir. 1999) (citations omitted).

<u>Analysis</u>

B. *<u>Procedure</u>*

Graduation Solutions argues without any case citations that Loukaides is not entitled to renewal of his Rule 50(a) motion under Rule 50(b) because the Court ruled on the Rule 50(a) motion during trial. [Dkt. 155 at 7-10]. But, as Loukaides correctly points out, the plain text of Rule 50(b) allows this motion:

> If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), <u>the court is considered to have submitted the action to the jury subject to the court's later deciding the legal</u>

**questions raised by the motion. No later than 28 days after the entry of judgment . . . the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59. In ruling on the renewed motion, the court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law.**

Fed. R. Civ. P. 50(b) (emphasis added); *see also Conway v. O'Brien*, 111 F.2d 611, 613 (2d Cir. 1940), *rev'd on other grounds,* 312 U.S. 492 (1941) ("Rule 50(b) provides that when such a motion is denied at the close of the evidence, the judge is to be 'deemed to have submitted the action to the jury subject to a later determination'; which is the equivalent of a reservation."); *Greer v. United States*, 408 F.2d 631, 635 (6th Cir. 1969) (holding judge who denied motion for directed verdict properly reconsidered the question on motion for judgment notwithstanding the verdict). The motion was timely filed. *See* [Dkt. 147]. Thus, the Court considers the merits of the motion.

### C. *Claims based on gradshop.com*

Loukaides first argues that he is entitled to judgment as a matter of law on any claim based on GradShop.com, including Counts 1-5 of the Second Amended Complaint, [Dkt. 147 at 3-9] (citing [Dkt. 31]), because he did not have notice that Graduation Solutions intended to pursue such claims at trial. As discussed in greater detail above, Loukaides had ample notice of this claim, defended against it and was not prejudiced by it. Just as Loukaides is not entitled to a new trial on this basis, the Court finds he is not entitled to judgment as a matter of law on it.

### D. *Ownership of gradshop.com and acadima.com*

Next, Loukaides argues that he is entitled to judgment on Counts 2 through 6 because Graduation Solutions neither pled nor presented evidence from which a reasonable jury could find that the corporate veil should be pierced.[5] [Dkt. 147 at 9-15]. Graduation Solution responds it submitted sufficient evidence that a jury could reasonably find that Loukaides directly, as an individual, owned and operated both gradshop.com and acadima.com, and therefore it did not need to plead or present evidence from which a reasonable jury could find that the corporate veil should be pierced. [Dkt. 155 at 20 to 25].

The parties presented the following evidence on the ownership of gradshop.com and acadima.com:

- **Graduation Solutions's witness, Kristoff Albanese, testified that Acadima, LLC owned GradShop.com [Dkt. 113 at 98:118-120].**

- **Frank Seviane testified that Acadima LLC "dealt with" GradShop.com, Acadima.com, and several other websites. [Dkt. 140 at 35:19-36:7].**

- **Frank Seviane testified that Loukaides "owned personally" Acadima.com and other websites, separate from the entity Acadima LLC. [Dkt. 140 at 40:5-21].**

- **Loukaides stated that he had not owned or operated and does not own or operate any websites for promotion, marketing or sale of graduation products. [Dkt. 140 at 218-19].**

- **Plaintiff's Trial Ex. 115, a Post-Marital Agreement filed in the context of Loukaides's divorce proceeding, states: "Apparel Group International Co., shall be the holding company for all trademarks and domains will be owned by [Loukaides] and Blue as set forth in attached Exhibit D. All intellectual property related to said trademarks and domain names shall be owned by [Loukaides]." [Plaintiffs Ex. 115, 8/5/2015 Post-Marital**

---

[5] Loukaides cites Connecticut law on veil piercing, but, as Acadima, LLC is a Texas LLC, Texas corporate law governs. Conn. Gen. Stat; § 34-275 ("The law of the governing jurisdiction of a foreign limited liability company governs: (1) the internal affairs of the company"); (Dkt. 1 (Compl.) at ¶ 11, 12 (Texas LLC).

Agreement § 5.6.7]. Exhibit D of the Agreement included gradshop.com. *Id.* at 50. *See* [Dkt. 140 at 207-217:15].

- Plaintiff's Trial Exhibit 16, Domain Registrant Information for gradshop.com, shows Loukaides as the registrant contact, administrative contact, and technical contact.

Loukaides argues (1) that Exhibit 115 is not sufficient evidence because a plain reading shows that Apparel Group International Co., Limited shall be the holding company and Loukaides was cut off from explaining that he personally never had ownership of GradShop.Com.; (2) a plain reading of Exhibit 16 shows that it only states that Loukaides was the Registrant Contact, Administrative Contact, and Technical Contact of GradShop.com, not owner, and is hearsay; and (3) Seviane's testimony should be discredited as self-serving, unreliable, and hearsay. [Dkt. 162 at 4-6].

The Court is unpersuaded. First, Loukaides did not object to Exhibit 16, Exhibit 115, nor to Seviane's testimony on the basis of hearsay during trial. *See Gronowski v. Spencer*, 424 F.3d 285, 294 n.1 (2d Cir. 2005) (holding that failure to object during trial "may prohibit the evidence from being considered hearsay" (citing *Diaz v. United States*, 223 U.S. 442, 450 (1912) ("[I]f hearsay evidence is admitted without objection, it is considered and given its natural probative effect as if it were in law admissible.")).

Next, while Exhibit 16 does not *require* the inference that Loukaides owned gradshop.com, the inference was not unreasonable. Finally, the Court finds that the text of Exhibit 115 may support the inference that Loukaides personally owned gradshop.com, and Mr. Loukaides had an opportunity to argue for a different interpretation on re-direct examination.

Since there is at least some evidence supporting the jury's verdict—Trial Exhibits 16 and 115, and Seviane's testimony—and there is no overwhelming evidence in favor of Loukaides, the Court does not grant Loukaides's motion on this ground. *Ladenburg Thalmann & Co., Inc.*, 408 Fed. App'x. at 403-04.

## E. *Elements of Actions: Copyright Infringement Elements*

Loukaides argues that he is not liable for copyright infringement because Graduation Solutions failed to meet its burden on all elements of its copyright infringement claim. Specifically, Loukaides argues that (1) Graduation Solutions did not present evidence that Loukaides personally copied the protected material; (2) Graduation Solutions did not present evidence that its website was original enough to receive copyright protection; (3) Graduation Solutions did not present sufficient evidence for a jury to find that gradshop.com infringed on Plaintiff's website; and (4) Graduation Solutions did not present sufficient evidence for the Court to submit the question of vicarious liability for copyright infringement to the jury. [Dkt. 147 at 15-21].

The Copyright Act grants copyright protection for original works of authorship in any tangible medium of expression," including "pictoral, graphic, and sculptural works." 17 U.S.C. § 102(A)(5). A copyright infringement action requires a plaintiff to prove (1) ownership of a valid copyright, and (2) actionable copying by the defendant of constituent elements of the work that are original. *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). A timely certificate of copyright registration "shall constitute prima facie evidence of the validity of the copyright" and copyrightability. 17 U.S.C. § 410(c); *Fonar Corp. v.*

*Domenick*, 105 F.3d 99, 104 (2d Cir. 1997). "To satisfy the second element of an infringement claim—the "unauthorized copying" element—a plaintiff must show both that his work was 'actually copied' and that the portion copied amounts to an improper or unlawful appropriation.'" *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003) (quoting *Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.*, 150 F.3d 132, 137 (2d Cir. 1998)).

First, the Court finds that there is at least some evidence supporting the reasonable inference that Loukaides personally copied the protected material. Seviane testified that Loukaides created and controlled Acadima.com, [Dkt. at 140:5-15], Loukaides listed Gradshop.com as his personal asset, [Ex. 115], and Loukaides is listed as the contact in multiple fields on the Domain Registrant Information sheet for GradShop.com. [Pl. Tr. Ex. 16]. The Court recognizes that Seviane also testified that Seviane was in charge of "day-to-day operations," while Loukaides did "nothing" with respect to the LLC, though his role was "of customer service and fulfillment." [Dkt. 140 at 37:4-38:6, 78:20 – 79:21]. The Court does not find that this testimony is "overwhelming" evidence suggesting that Loukaides did not personally copy the protected material. There was sufficient evidence for the jury to find that Loukaides personally copied the material.

The Court next observes that only the first argument was present in Loukaides's motion for a directed verdict. *See.* [Dkt. 115 at 8-11]. Loukaides does not argue that a new trial is required to prevent "manifest injustice," an independent reason to deny the other arguments. *See Lore*, 670 F.3d at 153. However, the Court considers the merits.

First, Graduation Solutions established a prima facie case that its website was original because it presented its copyright registrations and assignments as Exhibits 1-5. [Pls. Trial Ex. 1-5]. Next, Graduation Solutions presented evidence that gradshop.com infringed on Plaintiff's copyright of its website through the testimony of Albanese, its copyright registration and screenshots of its website, screenshots of gradshop.com, and its demonstrative comparison exhibits. [Dkt. 113 at 124:10-24]; Pl.'s Trial Exs. 1-7, 20-55, 93-106. Finally, for the same reasons that Graduation Solutions presented sufficient evidence that Loukaides personally copied the website to the jury, Graduation Solutions presented sufficient evidence of vicarious liability. *See Samet & Wells, Inc. v. Shalom Toy Co., Inc.*, 429 F. Supp. 895, 903–04 (E.D.N.Y. 1977), *aff'd*, 578 F.2d 1369 (2d Cir. 1978). Therefore, there was ample evidence supporting the jury's decision to which the Court must defer. Loukaides's motion on this ground is denied. *Ladenburg Thalmann & Co., Inc.*, 408 Fed. App'x. at 403-04.

### F. Elements of Actions: Trade Dress Preemption

Next, Loukaides argues that he is entitled to judgment as a matter of law on Graduation Solutions's Trade Dress Infringement claim because it is preempted by the Copyright Act, and Graduation Solutions failed to present evidence of specific trade dress elements that would escape preemption. [Dkt. 147 at 21-23]. As Graduation Solutions argues, Loukaides did not make this argument in his Rule 50(a) Motion. *See* [Dkt. 115]. Further, Loukaides does not argue that judgment as a matter of law is required to prevent "manifest injustice," *Lore*, 670 F.3d at 153. For the same reasons that the Court found that any error on this point was harmless in

its analysis of the motion for new trial, *see supra*, the Court finds that any error on this point would not cause manifest injustice. Therefore, the Court does not grant Loukaides's motion on this ground.

### G. *Elements of Actions: Trade Dress Infringement Elements*

Next, Loukaides argues that Graduation Solutions failed to present evidence for trade dress infringement.

#### 1. *Distinctiveness & Confusion*

Loukaides argues that Graduation Solutions presented no evidence on distinctiveness, and that Graduation Solutions provided insufficient evidence that any customer confusion was based on the "look and feel" of the website. As these issues are intertwined, the Court follows the parties in addressing them together, though courts typically organize these requirements into a sequential two-step showing, addressing first distinctiveness and then likelihood of confusion. *See Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 216 (2d Cir. 2012) (registered trademark case).

The district courts that have considered the issue have "almost universally recognized that a website's 'look and feel' can constitute a protectable trade dress." *FC Online Mktg., Inc. v. Burke's Martial Arts, LLC*, No. 14-CV-3685 SJF SIL, 2015 WL 4162757, at *9 (E.D.N.Y. July 8, 2015) (collecting cases).

A mark can be inherently distinctive, or it can be descriptive and have developed a secondary meaning. *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 210-16 (2000). "Factors that are relevant in determining secondary meaning include '(1) advertising expenditures, (2) consumer studies linking the mark to a

source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and, (6) length and exclusivity of the mark's use.' "*Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 226 (2d Cir. 2012) (quoting *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137 143 n.4 (2d Cir. 1997)); *see Ingrid & Isabel*, 70 F. Supp. 3d at 1137 (in the context of whether a website's look and feel were distinctive, "Evidence of deliberate copying is relevant to a determination of secondary meaning,' and 'in appropriate circumstances, deliberate copying may suffice to support an inference of secondary meaning.").

Here, Graduation Solutions offered ample evidence of the first, second, and fifth factors, and also spoke to the sixth factor. As to the first factor, Graduation Solutions's director of ecommerce, Kristoff Albanese testified that Graduation Solutions spent time and money developing the site and advertisements for the site, including offering free e-books and thousands of cap-and-gown samples annually. [Dkt. 113 at 78:2-79:20].

As to the second factor, Joann Kovel testified that from 2014 to 2017, she had seen a trend of an increasing number of purchasers from other websites calling Plaintiff's customer support regarding orders placed at Gradshop.com, sufficient confusion to cause Graduation Solutions to investigate. *Id.* at 170:1-4, 173:4-14. While Loukaides argues that Graduation Solutions provides no direct evidence connecting consumer confusion to GradShop.com's infringement of Plaintiff's trade dress, such additional evidence is not needed. *See Yellow Cab of Sacramento v. Yellow Cab of Elk Grove, Inc.,* 413 F.3d 925, 930 (9th Cir.2005)

(customer confusion concerning companies supported finding of secondary meaning).

As to the fifth factor, Graduation Solutions offered extensive evidence that Loukaides's website pages copied numerous aspects of Plaintiff's website, specifically explaining that gradshop.com copied Plaintiff's websites' orange-and-blue color scheme and user experience, and that acadima.com copied Plaintiff's website's promotional text, down to a typographical error. *E.g., id.* at 108:2-24; 111:10-112:22, 113:8-115:18, 119:4-14; 122: 20-123:24, 137:1-139:8. [Pl.'s Exs. 73-90, 105, 106].

Finally, factor six is neutral. Continuous exclusive usage of a trade dress over a five-year period may be evidence of acquired distinctiveness, *Landscape Forms, Inc. v. Columbia Cascade Co.,* 117 F.Supp.2d 360, 366–67 (S.D.N.Y. 2000), though it need not be. *In re Louisiana Fish Fry Prod., Ltd.,* 797 F.3d 1332, 1336 (Fed. Cir. 2015) (citing U.S.C. § 1052(f)). Periods of use of less than eighteen months count against finding secondary meaning, *see e.g., Braun v. Dynamics Corp. of Am.,* 975 F.2d 815, 822, 826 (Fed.Cir.1992), though use periods are not determinative. *See, e.g. L.A. Gear, Inc. v. Thom McAn Shoe Co.,* 988 F.2d 1117, 1130 (Fed.Cir.1993) (five-month period not too short for acquisition of secondary meaning). Periods of use of trade dress may include periods in which a product's appearance evolved. *New Colt Holding Corp. v. RJG Holdings of Fla., Inc.,* 312 F. Supp. 2d 195, 205-06, 209 (D. Conn. 2004) (finding that length of use of trade dress of appearance Colt revolver was 130 years, though appearance varied over that period).

Here, elements of Plaintiff's website were continuous over a five-year span, while other elements were not. Albanese testified that, by 2016, Plaintiff's website looked less similar to Defendants' websites than it had in 2011 because Graduation Solutions changed its website to "move away from the copy." [Dkt. 113 at 110:18-120]. But, Albanese testified to other similarities between Plaintiff's website and gradshop.com that persisted, including the location of a size chart and the navigation. [Dkt. 113 at 110:14-18]. The relevant exhibit also demonstrates the continuity of the Plaintiff's website in that Plaintiff's website had a blue and orange color scheme, including an orange search icon – and that gradshop.com mimicked these features. *See* Pl.'s Ex. 106. Given the conflicting ways in which this factor applies to Plaintiff's website, the Court finds that it is neutral. *See New Colt*, 312 F. Supp. 2d at 209 (finding that where factor applied in conflicting ways, there was a "factual question over how to weight this factor").

Balancing these factors, the Court affirms its original finding that there was sufficient evidence to support distinctiveness and a likelihood of customer confusion, and not an overwhelming amount of evidence that these requirements were not met. [Dkt. 141 at 78:23-79:16]; *see Yellow Cab*, 413 F.3d at 930 (finding genuine dispute as to secondary meaning where plaintiff presented to the district court various declarations detailing the history of the Yellow Cab of Sacramento, customer confusion concerning the companies, advertising data); *Gasser Chair Co. v. Infanti Chair Mfg. Corp.*, 155 F.3d 565, 47 USPQ 2d 1208, 1211 (Fed. Cir. 1998) (unpublished opinion) (applying Second Circuit law to affirm district court's finding

of secondary meaning based primarily on deliberate copying and actual confusion).

## 2. *Functionality*

Next, Loukaides argues that Graduation Solutions offered evidence that its trade dress is functional. [Dkt. 147 at 30-31]. "A product feature is functional, and cannot serve as a trademark [or trade dress], if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Yurman Design, Inc. v. PAJ, Inc.,* 262 F.3d 101, 116 (3d Cir. 2001) (quoting *TrafFix Devices, Inc v. Marketing Displays, Inc.*, 532 U.S. 23, 31 (2001). "Functional elements that are separately unprotectable can be protected together as part of a trade dress." *Millennium Labs., Inc. v. Ameritox, Ltd.*, 817 F.3d 1123, 1130 (9th Cir. 2016) (quoting *Fuddruckers,* 826 F.2d at 842.). For websites, font choice, text color, background color, color and pattern of wallpaper, model poses, and arrangement of functional elements may be non-functional. *Ingrid & Isabel, LLC* 70 F. Supp. 3d at 1105 (motion for summary judgment); *see Millennium Labs., Inc. v. Ameritox, Ltd.*, 817 F.3d 1123, 1130 (9th Cir. 2016) (holding that jurors could find that design of graph in medical report template was non-functional).

Graduation Solutions offered substantial testimony about possibly non-functional aspects of its website, including the brand colors, redesign of the logo, and the "user experience." [Dkt. 113 at 59:21-60:10, 137:1-139:8] The Court agrees with Loukaides that Graduation Solutions offered evidence that some elements of its website design, including its button locations, some language, its "in stock and ready to ship" widget, and its URL link structure helped improve Plaintiff's

Website's search engine ranking and persuade customers to buy its product. *E.g.* [Dkt. 113 at 93:1-20, 109:1-7]. However, in light of the testimony regarding elements that jurors could find to be non-functional, as well as the fact that separately functional elements may be protectable in aggregate as user-experience, the Court finds that Graduation Solutions offered sufficient evidence for a reasonable jury to find that Plaintiff's Website's trade dress was non-functional. Therefore, the Court affirms its previous conclusion that Graduation Solutions offered sufficient evidence to support its trade dress infringement claims.

H. *Elements of Action: Connecticut Unfair Trade Practices Act (CUTPA) & Unfair Competition*

In a one-sentence argument, Loukaides contends that "for the same reasons Plaintiff failed to elicit sufficient evidence regarding its Lanham Act claims, Plaintiff also failed to elicit sufficient evidence with respect to its Connecticut Unfair Trade Practices claim and common law unfair competition claim." [Dkt. 147 at 30-31]. A one-sentence analysis is appropriate: for the same reasons the Court found that Graduation Solutions provided sufficient evidence on its Lanham Act claims, Graduation Solutions provided sufficient evidence with respect to its Connecticut Unfair Trade Practices claim and common law unfair competition claim.

Loukaides also argues that, because Graduation Solutions's Lanham Act claim is preempted by the Copyright Act, Graduation Solutions's CUTPA claim is preempted also. [Dkt. 147 at 31]. However, just as Loukaides failed to make the preemption argument against Graduation Solutions's copyright claim in his motion for a directed verdict, he also failed to make it against Graduation Solutions's CUTPA claim. Therefore, as Loukaides has not shown "manifest injustice," "JMOL

may not properly be granted." *Lore*, 670 F.3d at 153. And, again, for the same reasons that the Court found that any error on copyright preemption was harmless in its analysis of the motion for new trial, *see supra*, the Court finds that any error on this point would not cause manifest injustice.

### I. *Elements of Action: Unjust Enrichment*

Loukaides argues that Plaintiff failed to demonstrate the elements of unjust enrichment because (1) Graduation Solutions did not allege that it actively provided something of value to Loukaides, but rather that Loukaides *took* something of value; and (2) Plaintiff did not present evidence of the fair and reasonable value of its allegedly infringed property.

To prevail on a claim for unjust enrichment, a plaintiff must prove: "(1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." *E.g. Vertex, Inc. v. City of Waterbury*, 898 A.2d 178, 190 ( Conn. 2006). An unjust enrichment claim is not based on a contract based on "assent," but rather arises out of "an obligation which the law creates out of the circumstances present, even though a party did not assume the obligation." *Ibid.* "A person who obtains a benefit by misappropriation or infringement of another's legally protected rights in any idea, expression, information, image, or designation is liable in restitution to the holder of such rights." Restatement (Third) of Restitution and Unjust Enrichment § 42 (2011). In seeking recovery under unjust enrichment, "the plaintiff must prove the fair and reasonable value of the property received or services rendered to the defendant." Connecticut Civil Jury Instructions, 4.5-13.

As the Court has previously stated, Graduation Solutions introduced sufficient evidence to the jury for it to reasonably infer that Loukaides was benefited by appropriating, without payment, the intellectual property of Graduation Solutions, and that Loukaides's failure to pay for use of the intellectual property harmed Graduation Solutions because Graduation Solutions invested time and money to develop and maintain its website. *See* [Dkt. 141 at 85:24-86:16]; [Dkt. 139 at 48:14-155:4]. Having given evidence that Loukaides was benefited, Graduation Solutions did not need to allege that it actively provided something of value to Loukaides.

Moreover, Graduation Solutions presented sufficient evidence regarding a fair and reasonable value of its allegedly infringed property. As the Court previously stated, the website indicated that it sold the same amount of graduation attire as the plaintiff which could be sufficient for the jury to reach a reasonable conclusion that Graduation Solutions's expert's assessment of the benefit derived by Loukaides from any infringement was valid. [Dkt. 141 at 85:24-96:16].

V. Conclusion

After considering each party's briefing, the Court DENIES Loukaides's motions for (1) renewed judgment as a matter of law [Dkt. 147], and (2) a new trial for the reasons set out above. [Dkt. 148].

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: March 26, 2020.